UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

LUIS GARCIA,                                    :

                          Petitioner,           :          **REPORT AND**
                                                           **RECOMMENDATION**
                                                           **TO THE HONORABLE**
            - against -                         :          **HAROLD BAER, JR.**

JOHN BURGE, Superintendent of Elmira            :          07 Civ. 2974 (HB)(FM)
Correctional Facility,
                                                :
                          Respondent.           :
---------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

I.      Introduction

               Petitioner Luis Garcia ("Garcia") brings this habeas corpus proceeding,

pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction on one count

of Murder in the First Degree, four counts of Intentional Murder in the Second Degree,

and three counts of Felony Murder in the Second Degree following a two-month jury trial

in Supreme Court, Bronx County.  On April 4, 2003, Justice Martin Marcus, before whom

the case was tried, sentenced Garcia to terms of imprisonment which, in the aggregate,

constitute imprisonment for life without parole.[1]

---

[1]      Garcia also pleaded guilty to one count of Criminal Possession of a Weapon in the
Third Degree.  At the sentencing, Justice Marcus imposed a prison term of one to three years on
that charge, to be served concurrently.  (Aff. of Ass't Dist. Att'y Lawrence H. Cunningham,
sworn to on July 6, 2007 ("Cunningham Affidavit"), ¶ 4 n.1).

1

In his habeas petition ("Petition" or "Pet."), Garcia claims that:  (a) his Fourth Amendment rights were violated because the police arrested him without probable cause or a warrant and searched his apartment without adequate consent; (b) his Due Process and Confrontation Clause rights were violated by the admission of a hearsay statement at trial; (c) his rights under New York's Criminal Procedure Law ("CPL") were violated by the suspension of jury deliberations for more than twenty-four hours; and (d) his sentence is unduly harsh and excessive.  (Pet. ¶ 12).

For the reasons set forth below, Garcia's habeas petition should be denied. Additionally, Garcia should be denied a certificate of appealability because he has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

II.    Background

A.    Trial

The evidence at trial would have permitted a reasonable juror to find that Garcia and an accomplice, Jose Cosme Pizarro ("Pizarro"),[2] murdered five members of a family in the Bronx over the course of one evening.

---

[2]    Pizarro was named in the same indictment, but eventually was tried separately. He was convicted of four counts of Murder in the Second Degree, for which he was sentenced to an aggregate indeterminate prison term of seventy-five years to life.  See People v. Pizarro, 24 A.D.3d 309 (1st Dep't 2005).

2

1.    <u>People's Case</u>

a.    <u>Crime Scenes</u>

On the night of March 2, 2000, five members of the Santos family were

murdered inside three Bronx apartment buildings.  In the apartment of Eduardo Santos

("Eduardo") at 2975 White Plains Road the police discovered the bodies of Eduardo,

Ishmael Santos ("Ishmael"), and Irvin Aquilar ("Irvin").  (T. 79, 112-14).[3]  Eduardo had

been shot in the face, with the bullet penetrating his spine.  (<u>Id.</u> at 1692).  Ishmael,

Eduardo's fourteen-year old nephew, had been shot three times, twice in the head and

once in the shoulder.  (<u>Id.</u> at 1683-84).  Irvin was the husband of Denise Santos

("Denise"), Eduardo's sister.  (<u>Id.</u> at 660).  He had been shot three times and stabbed five

times.  A knife was protruding from his neck.  He also had scrapes and bruises which

were consistent with someone having torn a chain from his neck.  (<u>Id.</u> at 1717-18, 1724,

1747-48).  As if this were not enough, the apartment had been ransacked.  (<u>Id.</u> at 1607).

A few blocks away, at 2934 Radcliff Avenue, where Irvin and Denise lived,

the police found Denise's body lying face up on the kitchen floor with a knife piercing

her neck.  (<u>Id.</u> at 488, 504-05, 517-18).  She had been stabbed fourteen times and the

house had been turned upside down.  (<u>Id.</u> at 488, 1712).

Finally, at 2825 Olinville Avenue, the police discovered the body of Evelyn

Santos ("Evelyn"), the sister of Eduardo and Denise, in the elevator of her apartment

---

[3]    "T. __" refers to the trial transcript.  "Ex. __" refers to the exhibits annexed to the
Cunningham Affidavit.

building.  She had been shot three times and stabbed three times.  (Id. at 442-44, 622, 1701-02).

The police soon learned that all of the bullets recovered from the 2975 White Plains Road and 2825 Olinville Avenue crime scenes were fired from the same nine millimeter Sig-Sauer pistol.  (Id. at 1554-63, 1574, 1577-83, 1586, 1589-94).

b.    Investigation and Arrests

Eduardo was someone known to be generous to his friends.[4]  (Id. at 577; 791).  In late 1998 or early 1999, Eduardo loaned $24,000 to Garcia.  (Id. at 763, 768). Although Eduardo confronted Garcia about the debt at least twice, Garcia had not repaid him.  (Id. at 669-71, 768-70).  Garcia and Pizarro also had been at the home of Denise and Irvin during the day on March 2.  (Id. at 608-09).  For this reason, the police investigation focused on them.

The police learned that Garcia had plans to go to dinner on March 2 with Evelyn, his ex-girlfriend.  (Id. at 610, 617-18).  Also, while the killings were underway, Eduardo's friend Oscar Marquez ("Marquez") had received a call from Eduardo's cell phone.  (Id. at 665-67).  In a six-minute voice mail message, which apparently was the result of this inadvertently-placed call, two unidentified men could be heard having an

---

[4]    In the defense case, Garcia explained that Eduardo had received $1.5 million as the result of a personal injury lawsuit.  (T. 1794-95).

inaudible conversation in Spanish.[5]  Additionally, in the background voices could be heard communicating an assignment in the 49th Precinct in the Bronx.  (Id. at 644-47, 1277-79).  There was circumstantial evidence that the Spanish speakers were Garcia and Pizarro, and a police officer opined that the police voices sounded like they were being transmitted over a scanner.  (See id. at 1279, 1291-92).

After the police determined that Garcia lived in Florida and drove a 1998 Pontiac Firebird, they issued an alert to Florida law enforcement officials.  (Id. at 853-54). On March 4, 2000, a Florida police officer observed Garcia and Pizarro cleaning the interior of the Firebird with Windex and other cleaning supplies in front of Garcia's Miami residence, after which Pizarro threw some clothing into a nearby dumpster.  (Id. at 885, 889-92, 900).  When Garcia and Pizarro started to drive away, the police stopped them and saw jewelry in the front seat of the car.  (Id. at 904, 910).  Later, when Garcia produced his driver's license, four of Denise's credit cards were stuck to his wallet.  (Id. at 924-25).  Also in his wallet was a bill of sale for the Sig-Sauer and a paper with New York City police scanner codes and precinct numbers on it.  (Id. at 1290-92, 1522-23). After the officers arrested Garcia and Pizarro, they found some of the victims' jewelry, including a woman's Coach watch, a bracelet, and a gold ring with diamonds on Pizarro's person.  (Id. at 923, 1296-1303).

---

[5]    Although the Spanish conversation was inaudible, Justice Marcus permitted the prosecutor to play a recording of the message, subject to a limiting instruction which precluded the jurors from considering the Spanish voices for any purpose other than to determine the number of people who were speaking.  (T. 1277).

Other Florida police officers knocked on the door of Garcia's apartment. Guillermina Mejia ("Mejia"), Garcia's girlfriend, let them in. (Id. at 918, 994-96). Mejia consented to a search which resulted in the seizure of bullets, jewelry, and cash from the apartment. (Id. at 1010-15, 1059). However, when the detectives noticed plastic bags containing metal pieces on the stove, Mejia ceased to be cooperative and began to question the detectives, who decided to stop the search.[6] (Id. at 1186-88).

### c.    Additional Evidence in Garcia's Apartment and Car

The police subsequently obtained a search warrant for Garcia's apartment and car. During the ensuing search of his apartment, they examined the plastic bags on the stove, which contained cut-up pieces of the nine millimeter Sig-Sauer pistol used in the murders. (Id. at 1344-45, 1354-57). On the porch the police found a DeWalt saw and grinder, along with a receipt for its purchase on March 4, 2000. (Id. at 1363-64, 1373-78). The police also discovered a laundry bag from a laundromat in the Bronx that Denise and Irvin had frequented. Inside the bag was a safe from Irvin's house that had been cut open. (Id. at 1312-14, 1317-19).

In the apartment, the police also found some of the victims' jewelry, including two Movado watches, a Rolex watch, an engagement ring, a necklace, and a

---

[6]    At a pretrial suppression hearing, Mejia testified that the detectives coerced her into signing a consent form for the search. (Ex. 1 (Pet'r's Br. on Appeal ("Pet'r's Br.")) at 37). The judge did not credit this testimony and found that Mejia had knowingly, voluntarily, and willingly consented to the search. (Id. at 118).

chain.  (Id. at 684-85, 1363, 1371, 1382).  Some blood on the necklace matched Denise's

blood to the exclusion of one trillion individuals.  (Id. at 1634-35).

      2.     Defense Case

Garcia was the sole defense witness.  He testified that he and Pizarro drove

to New York in his Firebird so that Pizarro could facilitate a sale of drugs to Irvin.  (Id. at

1830, 1833, 2136-37).  Pizarro convinced Garcia to bring along his nine millimeter pistol,

his police scanner, and the radio frequency codes for several Bronx police precincts.  (Id.

at 1833-35, 1837-38).  After they arrived, Pizarro obtained two kilos of cocaine from his

source, which he intended to sell to Irvin for about $50,000.  (Id. at 1854-57).  Eventually,

Garcia, Pizarro, Irvin, and Eduardo went to Eduardo's apartment at 2975 White Plains

Road on March 2, 2000, to complete the sale.  (Id. at 1881-83).  Garcia testified that while

he was parking his car, Pizarro went to the apartment with Eduardo and Irvin.  (Id. at

1881-84). Before Garcia got to the apartment, Pizarro came out of the building and said,

"let's get out of here."  (Id. at 1886).  Once in the car, Pizarro explained that he had

botched the drug deal and had shot Eduardo and Irvin.  (Id. at 1887-88).

Garcia testified that Pizarro threatened to kill him unless he followed

Pizarro's directions, which included going back to Eduardo's apartment to retrieve the

drugs that Pizarro accidentally had left behind.  (Id. at 1888-91).  Once inside, Garcia

discovered that Pizarro had also killed Ishmael, and he watched as Pizarro repeatedly

stabbed Irvin, who appeared to have been dead before the attack began.  (Id. at 1893-96).

Pizarro then forced Garcia to take him to Denise's home and Evelyn's apartment building, where Pizarro murdered them both.  (Id. at 1929-30, 1946-47).  Garcia claimed that he did not stop Pizarro or try to escape because he was afraid Pizarro would kill him too.  (Id. at 1924, 1930, 1942-43, 1947-48).

        3.     Pretrial Proceedings

Prior to trial, Justice William C. Donnino held a combined Mapp-Dunaway-Huntley hearing.[7]  (Ex. 2 (Resp't's Br. on Appeal ("Resp't's Br.")) at 3 n.2).  The hearing, which took place on various dates between May 16 and August 1, 2001, resulted in a transcript of more than 3,600 pages.  (Pet'r's Br. at 4 n.2; Docket Nos. 8-12).  At the conclusion of the hearing, in a sixty-one page decision, Justice Donnino denied the defendants' Fourth Amendment claims, but suppressed certain statements that Garcia made after his right to counsel attached.  (Docket No. 23 (Letter from Ass't Dist. Att'y Lawrence H. Cunningham to the Court, dated Jan. 5, 2008, Ex. 2)).

Subsequently, the People made an in limine application to introduce into evidence several statements that Evelyn had made to her friend Elizabeth Caraballo ("Caraballo") during a telephone conversation on the date of the murders.  The People sought to use this testimony under the hearsay exception recognized in Mutual Life Insurance Company v. Hillmon, 145 U.S. 285 (1892), for statements of future intent.

---

[7]    See Mapp v. Ohio, 367 U.S. 643 (1961) (lawfulness of search); Dunaway v. New York, 442 U.S. 200 (1979) (lawfulness of seizure and arrest); People v. Huntley, 15 N.Y.2d 72 (1965) (voluntariness of confession).

(Pet'r's Br. at 44).  The motion was granted.  (See Docket No. 23 Ex. 1 ("Hillmon

Decision")).  Accordingly, Caraballo testified at trial that Evelyn had called her to cancel

their plans to meet that evening because she intended to go out with Garcia instead.  (T.

608-09).  As Caraballo explained, Evelyn

> called me to tell me how happy she was because
> Eduardo had . . . told her to go over to his – to meet
> him at his Radcliff house . . . .  When she got there,
> Eduardo wasn't there, so she figured maybe he was
> next door in Denise's house. . . .  And when she went
> over to Denise's house and she knocked on the door,
> she said, guess who opened the door?  And I said who?
> She said, guess.  And I told her, who?  Just tell me
> who.  She said that Louie [Garcia] opened the door . . .
> but did not let her go inside the house.  And then he
> told her that he was going to see her that night.

(Id. at 608-09).

In his papers opposing the People's application, Garcia objected to this

testimony only to the extent that Caraballo proposed to testify that Evelyn told her that

she had seen Garcia at Denise's house the afternoon before she was killed.  (Pet'r's Br. at

44).  Justice Marcus held, however, that this testimony "concerning the circumstances in

which the [future] plan was made" was admissible.  (Hillmon Decision at 11).

### 4.    Jury Deliberations, Verdict, and Sentence

The jury began its deliberations on Monday, March 3, 2003.  (T. 2804,

2811).  That Friday, two jurors failed to appear.  (Id. at 2882-85).  Juror Number Two

telephoned to report that her child had been assaulted and needed to go the hospital.  Juror

Number Ten called in sick.  Garcia moved for a mistrial on the ground that Juror Number

Two was "grossly unqualified" because she would not be able to concentrate on the case when she returned.  The court denied this motion and adjourned further proceedings until Monday, March 10.  (Id. at 2885, 2889, 2895).

On Monday, before deliberations resumed, Justice Marcus questioned Juror Number Two and concluded that she remained qualified.  (Id. at 2896, 2901-05).  Garcia then moved for a mistrial on the previously-unstated ground that the jury deliberations had been suspended for more than twenty-four hours (exclusive of Saturday and Sunday) in violation of Section 310.10(2) of the CPL.  (Id. at 2907).  Justice Marcus rejected this motion as untimely.  (Id. at 2910).

After deliberations resumed, the jury reached a verdict on March 17, 2003, finding Garcia guilty of one count of Murder in the First Degree (for his role in killing Denise and causing the death of Evelyn as part of the same criminal transaction); four counts of Intentional Murder in the Second Degree (in connection with the deaths of Eduardo, Evelyn, Ishmael, and Irvin); and three counts of Felony Murder in the Second Degree (in connection with the deaths of Eduardo, Irvin, and Denise).  (Pet'r's Br. at 94; T. 2777, 3014-17).

On April 4, 2003, Justice Marcus sentenced Garcia to life without parole on the Murder in the First Degree count, consecutive terms of twenty-five years to life on each of the four counts of Intentional Murder in the Second Degree, to run concurrently with the sentence for Murder in the First Degree, and consecutive terms of twenty-five

years to life on each of the three counts of Felony Murder in the Second Degree, to run

concurrently with the other sentences.  (Pet'r's Br. at 95-96).

        B.     <u>Direct Appeal</u>

        Garcia appealed his conviction to the Appellate Division, First Department,

on the grounds that:  (1) the police lacked probable cause for his warrantless arrest; (2)

Mejia did not voluntarily consent to the search of Garcia's apartment; (3) his Due Process

and Confrontation Clause rights were violated by the admission of Caraballo's testimony

concerning Evelyn's statement; (4) the suspension of jury deliberations exceeded the

statutory twenty-four hour time limit under CPL § 310.10(2); and (5) his sentence of life

without parole was unduly harsh and excessive.  (Pet'r's Br. at ii).

        On December 29, 2005, the Appellate Division, First Department,

unanimously affirmed Garcia's conviction.  <u>See</u> <u>People v. Garcia</u>, 24 A.D.3d 308, 309

(1st Dep't 2005).  The court concluded that Justice Donnino properly denied Garcia's

motion to suppress the fruits of his arrest because "a very lengthy chain of incriminating"

evidence established that the police had probable cause.  <u>Id.</u>  The court further found that

there was no reason to set aside the trial court's credibility findings regarding the

voluntariness of the consent search.  Additionally, the court rejected Garcia's CPL § 310

claim because the record confirmed that it had been waived.  <u>Id.</u>  Finally, the court

"considered and rejected" Garcia's hearsay argument and stated that it "perceive[d] no

basis for reducing [his] sentence."  <u>Id.</u>

Garcia sought leave to appeal to the Court of Appeals, which denied his application on March 14, 2006.  See People v. Garcia, 6 N.Y.3d 833 (2006) (table).

C.      Petition

Garcia's Petition, dated March 12, 2007, was timely received by the Pro Se Office of the Court on March 19, 2007.  (See Docket No. 2).  In his Petition, Garcia reasserts each of the five claims that he relied upon before the Appellate Division.

III.    Discussion

A.      Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Instead, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner thus has the burden of proving, by a preponderance of the evidence, that his rights have been violated.  See Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or

12

involved an <u>unreasonable</u> <u>application of</u>, clearly established
Federal law, as determined by the Supreme Court of the United
States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, 229 F.3d 112, 119 (2d Cir.

2000), the Supreme Court has "construed the amended statute so as to give independent

meaning to 'contrary [to]' and 'unreasonable.'"  "Under the 'contrary to' clause, a federal

habeas court may grant the writ if the state court arrives at a conclusion opposite to that

reached by [the Supreme] Court on a question of law or if the state court decides a case

differently than [the] Court has on a set of materially indistinguishable facts."  <u>Williams</u>

<u>v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a

federal habeas court should "ask whether the state court's application of clearly

established federal law was objectively unreasonable."  <u>Id.</u> at 409.  This standard does not

require that reasonable jurists would all agree that the state court was wrong.  <u>Id.</u> at 409-

10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable

to all reasonable jurists.'"  <u>Stinson</u>, 229 F.3d. at 119 (quoting <u>Francis S. v. Stone</u>, 221

F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ

when a claim considered on the merits in state court "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."

13

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that:  "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.    Merits

1.    Fourth Amendment Claims

Garcia's first two claims are that the police arrested him without probable cause and searched his apartment without adequate consent.  These claims cannot be considered on habeas review in light of the Supreme Court's decision in Stone v. Powell, 428 U.S. 465 (1976).  Pursuant to that decision, "federal habeas corpus relief is not available on the ground that evidence produced at trial was the result of an unconstitutional search and seizure, unless the state denied the prisoner an opportunity for full and fair litigation of the claim."  Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991).  Thus, a Fourth Amendment claim can be addressed on habeas review only when (1) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations, or (2) there is a corrective mechanism, but the defendant was unable to use it because of an "unconscionable breakdown in the underlying process."

Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc)).

The State of New York clearly has provided defendants such as Garcia with the necessary corrective procedures through Section 710 of the CPL.  See Capellan, 975 F.2d at 70 n.1 ("federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [CPL] § 710.10 et seq. (McKinney 1984 & Supp. 1988), as being facially adequate") (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)); Vega v. Artuz, No. 97 Civ. 3775, 2002 WL 252764, at *12 (S.D.N.Y. Feb. 20, 2002).  In order to secure habeas relief, Garcia therefore must demonstrate that there was some sort of "disruption or obstruction" rising to the level of an "unconscionable breakdown" of state procedure.  Capellan, 975 F.2d at 70 (quoting Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)).  Here, however, the trial court conducted an unusually thorough pretrial suppression hearing and painstakingly analyzed Garcia's claims.  Accordingly, because Garcia was given a full and fair opportunity to litigate his Fourth Amendment claims prior to trial, they cannot be entertained by this Court.

2.    Confrontation Clause Claim

Garcia's next claim is that the admission of the portion of Evelyn's statement to Caraballo, in which Evelyn indicated that she had seen Garcia at Denise's home earlier that day, violated the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Neither of these constitutional protections entitles him to habeas relief on this ground.

15

In his decision granting the People's <u>Hillmon</u> application, Justice Marcus focused on the reliability of Evelyn's forward-looking statements to Caraballo about her plans for the evening.  Citing <u>People v. James</u>, 93 N.Y.2d 620, 633 (1999), and <u>United States v. Annunziato</u>, 293 F.2d 373 (2d Cir. 1961), the justice held that Caraballo's testimony about the circumstances giving rise to those plans – <u>i.e.</u>, the face-to-face meeting between Garcia and Evelyn at Denise's home earlier that day – was similarly admissible.  (<u>See</u> <u>Hillmon</u> Decision at 11).

After the trial, but before Garcia's conviction became final, the Supreme Court decided <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), which created a <u>per se</u> bar to the use of <u>testimonial</u> statements by an unavailable declarant – whether they were reliable or not – unless the defendant had a prior opportunity to cross-examine the declarant about the statements.  <u>See</u> <u>id.</u> at 68-69 ("the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes:  confrontation").  Although <u>Crawford</u> shifted the focus, the Supreme Court later emphasized in Davis v. Washington, 547 U.S. 813, __, 126 S. Ct. 2266, 2273 (2006), that the admission of a hearsay statement violates the Confrontation Clause only if the statement is "testimonial."

As the Supreme Court also has noted, its decision in <u>Crawford</u> did not "spell out a comprehensive definition" of the term "testimonial."  <u>United States v. Feliz</u>, 467 F.3d 227, 232 (2d Cir. 2006) (quoting <u>Crawford</u>, 541 U.S. at 68).  Nevertheless, in <u>Crawford</u>, the Supreme Court contrasted an "off-hand, overheard remark," which would not be testimonial, with a "statement produced through the '[i]nvolvement of government

16

officers' and with an 'eye towards trial,'" which would be testimonial because it

"'presents [a] unique potential for prosecutorial abuse.'" <u>Feliz</u>, 467 F.3d at 232 (quoting

<u>Crawford</u>, 541 U.S. at 51, 56 n.7) (brackets in original).  Building on this distinction, the

Second Circuit has defined the term "testimonial" to include "a declarant's knowing

responses to structured questioning in an investigative environment or in a courtroom

setting where the declarant would reasonably expect that his or her responses might be

used in future judicial proceedings."  <u>United States v. Saget</u>, 377 F.3d 223, 228 (2d Cir.

2004).

       Here, the statements that Evelyn made to Caraballo constituted casual

remarks to an acquaintance which were not testimonial.  <u>See</u> <u>United States v. Williams</u>,

506 F.3d 151, 154-57 (2d Cir. 2007) (co-defendant's statements to acquaintances about

his involvement in a homicide are not testimonial); <u>Saget</u>, 377 F.3d at 229 ("casual

conversation with a friend and potential co-conspirator" is not testimonial); <u>United States

v. Lee</u>, 374 F.3d 637, 645 (8th Cir. 2004) (casual statements between a mother and son

are not testimonial).  It follows that the admission of Evelyn's statement about her face-

to-face meeting with Garcia did not violate <u>Crawford</u>.[8]

---

[8]      The holding in <u>Crawford</u> is applicable to Garcia's hearsay claim because it was decided before Garcia's conviction became final.  <u>See</u> <u>Whorton v. Bockting</u>,127 S. Ct. 1173, 1181 (2007) (<u>Crawford</u> announced new rule of criminal procedure); <u>Teague v. Lane</u>, 489 U.S. 288, 310 (1989) (new constitutional rules of criminal procedure are inapplicable to cases that become final before new rules are announced); <u>Mungo v. Duncan</u>, 393 F.3d 327, 333 n.3 (2d Cir. 2004) (conviction becomes final for the purposes of <u>Teague</u> when the availability of direct appeal has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally decided); Sup. Ct. R. 13(1) (petition for writ of certiorari must be filed within ninety days after entry of judgment by state court of last resort).

17

In addition to his Confrontation Clause claim, Garcia argues that the admission of Caraballo's testimony about an alleged meeting between Evelyn and Garcia was improper because it did not meet a four-part test established in James, 93 N.Y.2d at 634-35. Under that test, certain foundational safeguards must be established before a statement of intent to engage in joint activity is admissible against the nondeclarant. Those safeguards are that: (1) "the declarant is unavailable"; (2) "the statement of the declarant's intent unambiguously contemplates some future action by the declarant, either jointly with the nondeclarant defendant or which requires the defendant's cooperation for its accomplishment"; (3) "to the extent that the declaration expressly or impliedly refers to a prior understanding or arrangement with the nondeclarant defendant, it must be inferable under the circumstances that the understanding or arrangement occurred in the recent past and that the declarant was a party to it or had competent knowledge of it"; and (4) "there is independent evidence of reliability . . . and evidence that the intended future acts were at least likely to have actually taken place." Id. at 634-35 (emphasis in original). The Appellate Division summarily rejected this claim. Garcia, 24 A.D.3d at 309.

It generally is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), because "rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of constitutional violation," Copes v. Schriver, No. 97 Civ. 2284, 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997); accord Taylor v. Curry, 708

F.2d 886, 891 (2d Cir. 1983). To prevail, Garcia consequently must show that the alleged

evidentiary error arising out of the admission of Evelyn's statement about the meeting

was "of constitutional dimension" and deprived him of "fundamental fairness." Rosario

v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); see also Roldan v. Artuz, 78 F. Supp. 2d

260, 267 (S.D.N.Y. 2000) (petitioner bears a "heavy burden" in showing that state

evidentiary errors deprived him of his constitutional right to a fair trial); McCray v. Artuz,

No. 93 Civ. 5757, 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994) (habeas relief only

warranted where petitioner demonstrates that the state evidentiary error was of

"constitutional magnitude"). For an evidentiary error to rise to this level, it must have had

a "'substantial and injurious effect or influence in determining the jury's verdict.'"

Brecht v. Abrahamson, 507 U.S. 619, 623, 637 (1993) (quoting Kotteakos v. United

States, 328 U.S. 750, 776 (1946)). Stated somewhat differently, the evidence "must have

been 'sufficiently material to provide the basis for conviction or to remove a reasonable

doubt that would have existed on the record without it.'" Dunnigan v. Keane, 137 F.3d

117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

   Garcia cannot possibly make the requisite showing here. At the outset,

because the challenged statement was admissible under Crawford, its use did not

constitute error of constitutional magnitude. Additionally, as Justice Marcus noted, the

admission of Evelyn's explanation of how her date with Garcia came about was proper

under state law. (See Hillmon Decision at 11-12 (citing James, 93 N.Y.2d at 633 (which

notes that "Hillmon itself was a case where the declaration of Walters' intention to travel

with Hillmon implicitly 'represented a previous arrangement between them'"), and

Annunziato, 293 F.2d at 377 (which, as Justice Marcus notes, "permitted not only

testimony of a statement of intention to send a bribe, but also reference to the telephone

call from Annunziato which produced the decision to send the money")) (internal

quotation marks omitted)).  Finally, even if Garcia were able to establish that the

admission of Evelyn's statement was error, Garcia acknowledged during the defense case

that he and Evelyn had formulated a plan to have dinner together when they met at

Denise's house.  (T. 1860-61, 2310-12).  Any error that might have occurred

consequently was harmless.[9]

---

[9]    Garcia raises an additional evidentiary claim in a letter to the Court dated August 6, 2007.  Specifically, Garcia alleges that he was prejudiced by the admission of the voice mail message containing the inaudible Spanish voices and police scanner transmissions.  (Docket No. 22 at 4).  He notes that this message was replayed for the jury the day before the verdict of guilty was returned.  (Id.).  Assuming that this claim had been properly exhausted (which it was not), it still would be frivolous in the absence of any showing that the contents of the tape deprived Garcia of a fair trial.  Rosario, 839 F.2d at 924.  Here, Garcia has made no such showing. Indeed, the audiotape was received pursuant to a limiting instruction which prohibited the jurors from considering the Spanish voices for any purpose other than to determine the number of persons who were involved in the conversation.  (T. 1277).  The jury must be presumed to have followed this instruction.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).  Moreover, the only other intelligible sounds on the tape were apparently police radio transmissions overheard on a scanner.  (Id. at 1279).  While evidence suggesting that the persons who committed the murders had access to a police scanner certainly was damaging, Garcia has not explained, much less shown, why its receipt was error. He therefore is not entitled to habeas relief on this ground.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

3.    CPL § 310 Claim

Garcia also contends that Justice Marcus violated CPL § 310.10(2) by suspending the jury's deliberations for longer than twenty-four hours. Garcia's argument in this regard relies exclusively on a New York state statute, CPL § 310.10(2). (Pet'r's Br. at 142-46). However, the only issue before this Court is whether Garcia's federal rights were violated. 28 U.S.C. § 2254(d)(1); see Diaz v. Herbert, 317 F. Supp. 2d 462, 473 (S.D.N.Y. 2004). Thus, as the AEDPA provides, Garcia can prevail only if the Appellate Division's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

CPL § 310.10(2) provides that a state court may declare the jury's deliberations in a criminal trial "to be in recess and may thereupon direct the jury to suspend its deliberations and to separate for a reasonable period of time to be specified by the court, not to exceed twenty-four hours, except that in the case of a Saturday, Sunday or holiday, such separation may extend beyond such twenty-four hour period." Under federal law, there is no comparable limitation on the period during which a jury's deliberations in a criminal case may be suspended. Garcia consequently is not entitled to federal habeas relief based on the suspension of jury deliberations for more than twenty-four hours. See Pena v. Rivera, No. 05 Civ. 3109, 2006 WL 2265078, at *7 (S.D.N.Y. July 31, 2006) (due process not violated by release of sequestered deliberating jury over a

21

weekend); <u>Hinds v. Ricks</u>, No. 00 Civ. 3578, 2003 WL 21817799, at *11-12 (E.D.N.Y. July 29, 2003) (petitioner not entitled to habeas relief despite trial court's decision to suspend jury deliberations to allow juror to attend child support proceeding).

       4.    <u>Excessive Sentence Claim</u>

Garcia's final claim is that his sentence of life without parole was unduly harsh and excessive. (Pet. ¶ 12). However, "[n]o federal constitutional issue is presented" when a petitioner's sentence is within the range prescribed by state law. <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992). Here, Garcia was convicted on one count of Murder in the First Degree, for which the maximum term is life without parole, and numerous other counts, for which the maximum term is twenty-five years to life in prison. N.Y. Penal Law § 70.00(2)-(5). Justice Marcus's sentences did not exceed these statutory limits. Accordingly, Garcia is not entitled to habeas relief on the ground that his sentence was excessive. Moreover, given Garcia's involvement in a vicious killing spree, Justice Marcus's decision to incapacitate Garcia for the maximum possible time was fully justified.

IV.    <u>Conclusion</u>

For the foregoing reasons, Garcia's habeas petition should be denied. Furthermore, because Garcia has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

## V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have ten (10) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Harold Baer, Jr. and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Baer.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:    New York, New York
          February 28, 2008

FRANK MAAS
United States Magistrate Judge

23

Copies to:

Luis Garcia
#03-A-2034
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902

Lawrence H. Cunningham, Esq.
Assistant District Attorney
Office of the Bronx County District Attorney
198 East 161st Street
Bronx, New York 10451